Heather Weine Brochin, Esq.
Day Pitney LLP
One Jefferson Road
Parsippany, NJ 07054
(973) 966-8199
hbrochin@daypitney.com

**ATTORNEYS FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SGS NORTH AMERICA INC.,** | : |
| **Plaintiff,** | : Civil Action No. 2:25-cv-656 |
| **v.** | : |
|  | **VERIFIED COMPLAINT** |
| **RAJ KAMAL SINGH,** | : |
| **Defendant.** | : |
|  | **Filed Electronically** |

Plaintiff SGS North America Inc. ("Plaintiff" or "SGS"), by way of verified complaint against defendant Raj Kamal Singh ("Defendant" or "Singh") alleges as follows:

## <u>NATURE OF ACTION</u>

1.      This is an action by SGS against a former employee for, *inter alia*: (a) using, disclosing and/or wrongfully retaining confidential and proprietary information, and/or trade secrets in violation of the Defend Trade Secret Act and the New Jersey Uniform Trade Secret Act; (b) violating his confidentiality obligations to SGS and to its clients giving rise to claims for breach of contract and breach of the implied covenant of good faith and fair dealing; and (c) converting, absconding with and/or not returning confidential and proprietary information and/or property known to Singh to belong to SGS or its clients.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff SGS is a Delaware corporation with its principal place of business at 201 Route 17 North, 7th Floor, Rutherford, New Jersey 07070.  SGS is the nation's leading provider of inspection, testing, verification and certification services.

3.      Defendant Singh is an individual who, according to SGS records, resides at 3937 Archer Lane, Columbia, Pennsylvania 17512.  From on or about August 15, 2022 to in or about August 2024, Singh was employed by SGS as a Lab Supervisor, LC-MS/MS.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Defend Trade Secret Act, 18 U.S.C. § 1836 *et seq*.

5.      This Court has supplemental jurisdiction over SGS's state law claims pursuant to 28 U.S.C. § 1367(a).  There exists a common nucleus of facts between the federal claims and the highly related breach of contract and other state statutory and common law claims.

6.      This Court has personal jurisdiction over Singh because, upon information and belief, Singh has committed acts in contravention of the Defend Trade Secrets Act, the New Jersey Uniform Trade Secrets Act, and common law within this judicial district.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because, among other reasons, the events giving rise to the claims herein occurred and continue to occur in this judicial district.

## NATURE OF SGS'S BUSINESS & SINGH'S EMPLOYMENT

8.      SGS specializes in inspection, testing, verification and certification services, including testing water and soil for the presence of per- and polyfluoroalkyl substances ("PFAS"), which are a diverse group of chemicals used as water and oil repellents.  Since their development, PFAS have been used in a variety of industries; however, they are now known to present a significant threat to the ecosystem and human health due to their persistence in the environment.

9.    SGS is one of a limited number of companies in the world that is able to provide its clients with leading edge PFAS determination products.  SGS's position in the marketplace is unique due to the breadth of services it is able to offer with respect to PFAS determination products.

10.    As part of its PFAS business, SGS utilizes various standard operating procedures ("SOPs") and related analytical method development documentation, which together constitutes specific recipes developed by SGS's in-house chemists, which form the operating instructions for methods used by SGS to determine analytical concentrations of targeted chemicals, such as PFAS.

11.    In the case of PFAS, those SOPs and related analytical method development documentation are complex and of considerable depth, being the result of thousands of hours of research and trial and error SGS's laboratories have to go through in order to perfect its analytical methods.

12.    Given the monetary investment and time SGS puts into developing its PFAS business, it is at the forefront of PFAS determinative technology and analytical chemistry approaches.

13.    SGS has been developing its PFAS business for approximately twenty years which, upon information and belief, is almost a decade longer than any of its competitors have been developing similar business.

14.    As a SGS employee, Singh was responsible for leading and managing the daily analytical operations of SGS's PFAS laboratory located in Dayton, New Jersey.  In that role, Singh helped develop, validate, and certify numerous unique, confidential and proprietary analytical methods for the inspection and testing for PFAS, including, but not limited to, method 1633 for PFAS in non-potable waters, biosolids and soil samples; Environmental Protection Agency

("EPA") methods 533 and 537.1 for PFAS in drinking water; and EPA 8327 and ASTM D7968 screening methods for PFAS in non-potable drinking waters and soil samples.

15.    SGS shared with Singh the identity of SGS's clients and vendors as well as its confidential information about client projects and/or vendor projects.  As an employee of SGS, Singh was given access to certain trade secrets of SGS and SGS's confidential information and property, including analytical methods, recipes, screening methods, strategic initiatives, plans relating to SGS's PFAS business, and other intellectual property in various stages of development. SGS entrusted Singh with its confidential and proprietary information and trade secrets and that of its clients in order to perform his role at the company.

16.    To protect SGS's client relationships, goodwill, confidential and proprietary information and trade secrets and that of its clients, at the start of his employment Singh executed a Confidentiality and Assignment of Invention Agreement (the "Non-Disclosure Agreement"), which included a non-disclosure provision and a return of property requirement.  A copy of the Non-Disclosure Agreement is attached hereto as **Exhibit A**.

17.    The Non-Disclosure Agreement provides in pertinent part:

Employee acknowledges that the Company has a compelling need to maintain confidentiality, and further recognizes that Employee's employment with the Company will place Employee in a position of special trust and confidence with access to confidential information concerning the Company and its operations.

For purposes of this Agreement, "Confidential Information" includes all non-public information and know-how, whether or not in writing and in whatever form (including electronic and/or e-mail form), concerning Company or its clients or the business or financial affairs of Company or of its clients.  By way of illustration, but not limitation, Confidential Information may include trade secrets, inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, financial data, pricing data, personnel data, computer programs, client/customer lists, referral sources, and supplier lists.

**During Employee's employment with Company and thereafter, Employee shall not – without prior written consent of Company – disclose or otherwise**

**disseminate any Confidential Information to third parties or use Confidential Information for any purpose other than carrying out the terms of Employee's engagement by Company.**

**Other than in the ordinary course of Company's business, Employee shall not – without prior written consent of Company – directly or indirectly copy, take, or remove from Company's premises any Confidential Information in any form (including electronic and/or e-mail form).**

At the request of Company or upon the termination of Employee's employment with Company for any reason, Employee shall immediately return and surrender to Company originals and all copies (including e-mails) of any Company property, including but not limited to any Confidential Information.

(**Exhibit A** (emphasis added)).

18.     The Non-Disclosure Agreement also contains an assignment of invention provision.

19.     The Non-Disclosure Agreement provides in pertinent part:

Employee hereby assigns to the Company all of Employee's right, title and interest in and to any and all ideas, designs, photographs, drawings, plans, computer programs or systems (including source code), concepts, techniques, algorithms, compositions, data, database technologies, discoveries, domain names, formulas, improvements, inventions, works, practices, processes, research material (the "Inventions"), whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or jointly with others, whether at the suggestion of the Company or otherwise, during the period of Employee's employment with the Company.  **Employee agrees that all such inventions are the sole and exclusive property of the Company**.

(**Exhibit A** (emphasis added)).

20.     The Non-Disclosure Agreement further provides that:

Notwithstanding any authority to the contrary: (1) Company shall have the right to injunctive relief to restrain or enjoin any actual or threatened breach of the provisions of this Agreement; . . . and (3) if Company prevails in a legal proceeding to enforce this Agreement, then Company shall be entitled to recover its costs and fees incurred, including its attorney's fees, expert witness fees, and out-of-pocket costs, in addition to any other relief it may be granted.

(**Exhibit A**).

21.    Singh likewise agreed to abide by SGS's company policies, including those concerning the protection of SGS's confidential and proprietary information and trade secrets.

22.    Prior to beginning his employment with SGS, Singh also signed a Relocation Repayment Agreement, pursuant to which SGS paid Singh a lump sum of $15,000.00 "to assist with moving to the area of [Singh's] work location."

23.    Under the terms of the Relocation Repayment Agreement, Singh agreed to the following:

> You understand that you will need to complete your relocation by September 30, 2022.  If you fail to do so, you will be liable for all interest and costs, including, but not limited to, attorneys' fees incurred by the Company in enforcing this Agreement.

24.    Despite the terms of the Relocation Repayment Agreement, Singh never relocated from his residence in Pennsylvania to the area of his work location with SGS in Dayton, New Jersey.

25.    Singh failed to repay to SGS the relocation payment which was advanced to him.

### SINGH'S WRONGFUL CONDUCT

26.    On August 24, 2024, Singh connected a Toshiba brand external USB hard drive, bearing serial number 20240310006465F (the "Toshiba USB Device"), to his SGS-provided laptop computer, a Lenovo ThinkPad T-14 bearing serial number PF-3JAPY8 (the "Work Laptop") and copied to the Toshiba USB Device numerous SGS files that were stored on the Work Laptop and stored on SGS's Microsoft OneDrive.

27.    After copying the files to the Toshiba USB Device, Singh deleted from the Work Laptop the files that were stored on the Work Laptop and the Microsoft OneDrive.

28.     Then, on or about August 26, 2024, Singh informed David Chastain, General Manager of SGS's PFAS laboratory in Dayton, that he was resigning from his employment with SGS.

29.     On or about August 29, 2024, Chastain asked Singh whether his decision to leave SGS was because he secured new employment, to which Singh responded that he had not secured new employment.

30.     On or about September 16, 2024, SGS learned that Singh had begun working for one of its direct competitors, ALS Global, in a directly competitive role as a PFAS Product Lead.

31.     Thereafter, SGS retained the consulting firm Crowe LLP ("Crowe") to perform a forensic analysis of the Work Laptop.

32.     By letter dated September 23, 2024, SGS reminded Singh of his continuing obligations under the Non-Disclosure Agreement and sent him a copy of the Non-Disclosure Agreement.

33.     On October 3, 2024, Crowe provided SGS with a report (the "Due Diligence Summary") summarizing its forensic analysis of the Work Laptop.

34.      The Due Diligence Summary confirmed that on August 24, 2024, prior to Singh's departure from SGS, the Toshiba USB Device was connected to the Work Laptop.

35.     The Due Diligence Summary further confirmed that on August 24, 2024, a mass copy of files occurred from the Work Laptop to the Toshiba USB Device.

36.     Further investigation by SGS confirmed that the files copied from the Work Laptop to the Toshiba USB Device on August 24, 2024, included various pieces of confidential and proprietary information and trade secrets belonging to SGS including, but not limited to, files

regarding SGS's business strategies, client information, analytical and screening methods, standard operating procedures for SGS's PFAS business, and PFAS recipes.

37.    SGS's in-house and outside counsel sent Singh several written communications between October 8 and October 30, 2024, notifying Singh of his violation of the Non-Disclosure Agreement and improper copying of SGS confidential and proprietary information to the Toshiba USB Device.

38.    In written communications on October 10, October 17, October 18, October 22, October 25, and October 30, counsel for SGS requested immediate return of the Toshiba USB Device.

39.    Counsel explained to Singh, in certain written communications, SGS's intention to send the Toshiba USB Device for forensic review.

40.    Counsel also requested that Singh identify all devices to which he connected the Toshiba USB Device or any steps taken to copy the confidential and proprietary information contained on the Toshiba USB Device.

41.    Counsel also requested from Singh a written communication identifying all data storage devices and cloud storage accounts that Singh used to store SGS non-public files or confidential or proprietary information.

42.    In an October 18, 2024 letter, Singh acknowledged copying data to the Toshiba USB Device, including scientific development methods and work that he developed during his time at SGS.  Singh also acknowledged that "SGS holds legal ownership" of certain methods that were copied to the Toshiba USB Device.

43. Singh never identified the devices to which he connected the Toshiba USB Device or any steps taken to copy the confidential and proprietary information and trade secrets contained on the Toshiba USB Device.

44. Despite Singh's failure to acquiesce to SGS's reasonable demand for the delivery of the Toshiba USB Device for forensic inspection, SGS continued to cooperate with the unrepresented Singh, even urging him to retain counsel to facilitate resolution of Singh's wrongful conduct.

45. Due to Singh's failure to deliver the Toshiba USB Device for forensic inspection and given the confidential and proprietary SGS information contained on that device, in late October 2024, SGS took steps to prepare to file a legal action seeking an injunction directing the return of SGS's information and the forensic review of the Toshiba USB Device.

46. On or about October 31, 2024, Singh retained counsel to represent him with respect to SGS's demand for the return of the Toshiba USB Device.

47. On or about November 1, 2024, Singh mailed the Toshiba USB Device to Crowe.

48. Due to the involvement of counsel and what appeared to be an intention to cooperate in the return of SGS's confidential and proprietary information, SGS did not file a lawsuit at that time.

49. During November 2024, SGS engaged in prolonged, good faith discussions with Singh's counsel regarding the forensic analysis of the Toshiba USB Device, and the steps SGS would take to ensure the continuing confidentiality of both SGS's confidential and proprietary business information and trade secrets, as well as personal information regarding Singh which he willfully comingled with SGS's confidential and proprietary information on the Toshiba USB Device.

50.     To that end, Singh's counsel insisted that the parties agree, in writing, to certain aspects of the forensic review of the Toshiba USB Device, further prolonging the review process and increasing the expenses incurred by SGS for the recovery of its confidential and proprietary information.

51.     On or about December 2, 2024, Singh and SGS agreed to certain terms regarding the treatment of non-SGS information on the Toshiba USB Device and ongoing cooperation (the "December 2024 Agreement").

52.     The December 2024 Agreement contains a provision requiring that Singh:

[C]ooperate with SGS's ongoing efforts to recover the Confidential Information, **including but not limited to searching any additional devices that may contain Confidential Information**, cooperating with reasonable requests from SGS relating to the deletion or recovery of Confidential Information, and signing an affidavit relating to the information contained on the Toshiba USB Device and Confidential Information.

53.     In exchange, SGS agreed not to intentionally access any files containing information solely related to Kipos Tech, Singh's spouse's company, and, in the event of inadvertent disclosure of such information to SGS, to take affirmative steps to protect such information.

54.     On or about December 10, 2024, Crowe provided SGS with a report detailing its findings from its forensic analysis of the Toshiba USB Device (the "Protocol USB Analysis Report").

55.     The Protocol USB Analysis Report revealed that the Toshiba USB Device was connected to a computer on four separate dates after Singh conducted a mass copying of files containing SGS confidential and proprietary information to the Toshiba USB Device on August 24, 2024.

56.    The Protocol USB Analysis Report also indicated that files were accessed by a Windows machine that was not the Work Laptop on three separate dates after August 24, 2024.

57.    Additionally, the Protocol USB Analysis Report revealed that folders on the Toshiba USB Device which contained SGS's highly confidential and proprietary SOPs were accessed by foreign computers that were not the Work Laptop on August 25 and October 8, 2024.

58.    Moreover, on September 26, 2024, approximately 4,352 files, almost the entirety of what was contained on the Toshiba USB Device, had their "last accessed" timestamps updated in rapid succession, indicating that those files may have been copied to another device on that date.

59.    On December 10, 2024, SGS sent a letter to Singh's counsel informing counsel of the results of the Protocol USB Analysis Report and attaching a copy of that Report for counsel's review.

60.    The December 10, 2024, letter to Singh's counsel also noted that Singh failed to identify all devices to which he connected, at any time, the Toshiba USB Device or any steps taken to copy the SGS confidential and proprietary information contained on the Toshiba USB Device.

61.    On December 18, 2024, Singh's counsel sent a letter to SGS admitting that Singh connected the Toshiba USB Device to a personal Windows laptop bearing serial number 00262568235 (the "Personal Laptop") on three separate dates after Singh copied SGS's confidential and proprietary information to the Toshiba USB Device.

62.    Counsel's December 18, 2024, letter to SGS also indicated that Singh accessed files containing SGS confidential and proprietary information on October 8, 2024.

63.    On several occasions from December 19, 2024 through the present, SGS's counsel engaged in good faith communications with Singh's counsel in an effort to facilitate the return to SGS of all of its confidential and proprietary information which includes forensic analysis of the

Personal Laptop to determine whether Singh copied SGS's confidential and proprietary information or otherwise took additional steps to impermissibly retain, copy or otherwise misappropriate SGS's Confidential Information.

64.    In an effort to avoid litigation, SGS's counsel met and conferred about the results of the Protocol USB Analysis Report, provided responses to inquiries and even asked Crowe to evaluate a review approach proposed by Singh which was found to be unsound given it would alter metadata on the Personal Laptop.

65.    Despite these efforts and communications, to date, Singh has failed to deliver to Crowe the Personal Laptop for forensic analysis.

66.    SGS maintains a reasonable belief that the Personal Laptop contains confidential and proprietary information belonging to SGS.

67.    Despite SGS's reasonable belief that the Personal Laptop contains confidential and proprietary information belonging to SGS, and despite Singh's assurance that he would cooperate with SGS's efforts to recover all of its confidential and proprietary information, Singh has refused to adequately assuage SGS by providing Crowe with the Personal Laptop for forensic analysis.

68.    Accordingly, Singh failed to return to SGS confidential or proprietary information or trade secrets which he copied.

69.    Singh initially retained the confidential and proprietary information of SGS contained on the Toshiba USB Device and refused to return it.  After significant expense to SGS, Singh tendered the Toshiba USB Device.

70.    Singh continues to retain confidential and proprietary information of SGS that may have been copied from the Toshiba USB Device to the Personal Laptop without authorization and refuses to provide access to the Personal Laptop.

71.     SGS maintains a reasonable belief that Singh's disclosure of its confidential and proprietary information could be used to accelerate its competitors' PFAS businesses, an area where SGS currently holds a significant competitive advantage.

72.     Singh knows or has reason to know that he has acquired confidential and proprietary information, trade secrets, and/or property that do not belong to him.

73.     Singh knows or has reason to know that he has a contractual obligation to preserve and protect the confidential and proprietary information, trade secrets, and/or property belonging to SGS and/or its clients.

74.     Singh has not returned the information or property to SGS.

75.     Singh's actions reveal a plan that was executed to wrongfully copy, retain and use SGS's confidential and proprietary information and/or property in a manner not authorized by the Non-Disclosure Agreement, in breach of his common law duties, and in violation of various federal and state laws.

## SINGH'S THEFT AND USE AND/OR DISCLOSURE OF SGS'S CONFIDENTIAL INFORMATION

### COUNT ONE
**(Misappropriation of SGS's Trade Secrets in Violation of the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836 *et seq.*)**

76.     SGS incorporates by reference the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77.     SGS owns trade secrets and confidential and proprietary information related to its services, which are used throughout the United States and worldwide in interstate commerce.

78.     The confidential and proprietary information and trade secrets wrongfully acquired without the prior written authorization of SGS and, upon information and belief, accessed by Singh

after his employment with SGS ended include the information described in ¶¶ 10-11 and 14-15 above that Singh wrongfully retains, and other property and knowledge about the services that he developed while in the employ of SGS.

79.    That confidential and proprietary information and those trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, persons and organizations that are not SGS.

80.    During the course of his employment with SGS, SGS imparted and entrusted their trade secrets and confidential and proprietary information to Singh under circumstances of trust and confidence rendering it protectable even if there were no contractual obligations relative to confidential information.

81.    SGS takes careful, affirmative steps to safeguard its trade secrets and confidential and proprietary information.  SGS safeguards its confidential information and trade secrets and does so through non-disclosure agreements and limited access to confidential information and trade secrets.

82.    Throughout Singh's employment, he had access to trade secrets, and confidential and proprietary information of SGS and its clients.

83.    SGS has expended significant effort and expense to develop their trade secrets and confidential and proprietary information.

84.    SGS's trade secrets and confidential and proprietary information cannot be learned by a competitor's observation, nor can they be duplicated from public sources

85.    SGS's trade secrets and confidential and proprietary information, if disclosed to a competitor, would provide them with an unfair advantage.

86.     By virtue of the foregoing conduct and acts, Singh misappropriated SGS's confidential and proprietary information and/or trade secrets in violation of SGS's rights under 18 U.S.C. § 1836 *et seq*.

87.     Upon information and belief, Singh has used and/or will inevitably use SGS's confidential and proprietary information and/or trade secrets regarding SGS's business strategies and techniques to unfairly compete.

88.     SGS has been irreparably damaged by Singh's activities in the manner set forth above and will be irreparably damaged unless Singh is enjoined from continuing to commit the aforesaid acts.  SGS has no adequate remedy at law.

89.     As a direct and proximate result of Singh's conduct, SGS has been and continues to be injured in their business and property.

90.     SGS seeks an injunction against Singh based upon the actual and threatened misappropriation.

91.     SGS seeks an injunction against Singh based upon the actual and threatened misappropriation pursuant to DTSA.

92.     SGS seeks the return and destruction of all copies of its confidential and proprietary information and/or trade secrets and other affirmative acts necessary to protect and preserve its valuable rights.

93.     As a result of Singh's willful and malicious conduct, SGS is entitled to recover statutory damages, including, but not limited to, punitive damages to the extent permitted by the DTSA.

94.     As a result of the Singh's willful and malicious conduct, SGS seeks attorneys' fees and costs, including a reasonable sum to cover the services of expert witnesses including forensic

experts and the costs incurred by SGS for the recovery of its Confidential Information to date, to the extent permitted by the DTSA.

## **COUNT TWO**
### **(Misappropriation of SGS's Trade Secrets in Violation of New Jersey's Trade Secret Act N.J.S.A. 56:15-1 *et seq.*)**

95.     SGS incorporates by reference the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

96.     SGS's confidential and proprietary information as described above constitutes trade secrets within the meaning of the New Jersey Uniform Trade Secrets Act, N.J.S.A. 56:15-1 *et seq.* (the "NJUTSA").

97.     SGS owns valuable and secret information, including, but limited to, SGS's confidential information that derives independent economic value, actual, or potential, from not being generally known, and not being readily ascertainable by proper means, by others that give SGS actual and potential economic advantage over others.

98.     SGS's confidential and proprietary information, including, but not limited to, the trade secrets, confidential and/or proprietary information, is vital to SGS's ability to fairly and successfully compete.

99.     SGS has expended significant effort and expense to develop SGS's confidential information and furnished the information to Singh in confidence.

100.     By the aforementioned conduct set forth above, Singh misappropriated SGS's confidential information through improper means in violation of the NJUTSA.

101.     Singh acquired trade secrets belonging to SGS through improper means in violation on N.J.S.A. 56:15-2(1).

102.     Upon information and belief, Singh used trade secrets and/or confidential information belonging to SGS without the consent of SGS in violation on N.J.S.A. 56:15-2(2).

103.     Singh's disclosure, retention, use, and possession of SGS's trade secrets and/or confidential information constitutes a violation of the NJUTSA.

104.     It is inevitable that Singh will use and/or disclose to third parties the trade secrets and confidential information of SGS.

105.     As a direct and proximate result of Singh's conduct, SGS has been and continues to be injured in their business and property.

106.     SGS seeks an injunction against Singh based upon the actual and threatened misappropriation pursuant to N.J.S.A. 56:15-3(a).

107.     Pursuant to N.J.S.A. 56:15-3(c), SGS seeks the return and destruction of all copies of its confidential and proprietary information and/or trade secrets and other affirmative acts necessary to protect and preserve its valuable rights.

108.     As a result of Singh's willful and malicious conduct, SGS is entitled to recover statutory damages, including, but not limited to, punitive damages to the extent permitted by N.J.S.A. 56:15-4(b).

109.     As a result of the Singh's willful and malicious conduct, SGS seeks attorneys' fees and costs, including a reasonable sum to cover the services of expert witnesses including forensic experts, to the extent permitted by N.J.S.A. 56:15-4(b).

## COUNT THREE
### (Breach of Contract – the Non-Disclosure Agreement)

110.     SGS incorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

111.    The Non-Disclosure Agreement is a valid and binding contract as between Singh and SGS.

112.    Singh voluntarily entered into the Non-Disclosure Agreement in exchange for valuable consideration including, among other things, access to confidential information, knowledge and know-how, training, exposure to strategic partner, customer and client relationships, and continued employment

113.    By virtue of the conduct described above, Singh has breached and continues to breach the Non-Disclosure Agreement.

114.    As a direct and proximate result of his breach, SGS has been and continues to be injured in their business and property.

115.    SGS has the right to seek injunctive relief under the terms of the Non-Disclosure Agreement.

116.    SGS seeks injunctive relief based on the actual breach of the Non-Disclosure Agreement.

## COUNT FOUR
### (Breach of Implied Covenant of Good Faith and Fair Dealing - the Non-Disclosure Agreement)

117.    SGS incorporates by reference the allegations contained in paragraphs 1 through 116 as if fully set forth herein.

118.    Singh is bound by the covenant of good faith and fair dealing implied by law in the Non-Disclosure Agreement.

119.    By virtue of the conduct described above, Singh has breached and continues to breach the covenant of good faith and fair dealing implied in the Non-Disclosure Agreement.

120.    As a direct and proximate result of his breach of the implied covenant of good faith and fair dealing, SGS has been and continues to be injured in their business and property.

## COUNT FIVE
### (Breach of the Contract – Relocation Repayment Agreement)

121.    SGS incorporates by reference the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

122.    The Relocation Repayment Agreement is a valid and binding contract as between Singh and SGS.

123.    Singh voluntarily entered into the Relocation Repayment Agreement in exchange for valuable consideration.

124.    By virtue of the conduct described above, Singh has breached the Relocation Repayment Agreement.

125.    As a direct and proximate result of his breach, SGS sustained damages.

## COUNT SIX
### (Conversion)

126.    SGS incorporates by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.    The confidential and/or proprietary information, trade secrets and property belong to SGS.

128.    Singh has deprived SGS of their property, including, but not limited to, SGS's confidential information and/or other proprietary information and trade secrets.

129.    Under the Non-Disclosure Agreement, Singh was required to return to SGS all of its property, including, but not limited to, SGS's confidential information and/or other proprietary information and trade secrets.

120436015.10

-19-

130.    Singh has not returned to SGS the confidential and proprietary information and trade secrets contained on the Personal Laptop.

131.    As a direct and proximate result of Singh's conduct, SGS has been and continues to be injured in their business and property.

**WHEREFORE**, Plaintiff SGS NORTH AMERICA INC. demands judgment against Defendant RAJ KAMAL SINGH, as follows:

1.    Granting a temporary restraining order and preliminary and permanent injunction without the need for Plaintiff to post bond:

a.    Compelling Defendant to return to SGS all their property including, but not limited to, all hard copy or electronically maintained documents and other materials and things in Singh's possession, custody and/or control which contain confidential and/or proprietary information and/or trade secrets of SGS and its clients;

b.    Compelling Defendant to deliver to SGS and/or make available to SGS for remote imaging the Personal Laptop for forensic inspection, as well as any other computer(s) and/or any other storage device(s) (including, but not limited to, the Personal Laptop), electronic or otherwise, and/or email folder(s) and/or account(s) in any and all account location(s), that are in Defendant's possession, custody or control and which contain SGS property including, but not limited to, any and all electronic files which contain confidential and/or proprietary information and/or trade secrets of SGS;

c.    Compelling Defendant to identify and deliver and/or make available to SGS (or provided SGS access to) any other computer(s), data storage device(s) (i.e., USB drives, external hard drives, etc.), cloud storage accounts, and/or email folder(s) and/or account(s), that are in Defendant's possession, custody or control: (a) that have ever been used to store non-public

files or other confidential and proprietary information and/or trade secrets of SGS or its clients; (b) that have ever been used in connection with SGS's business; or (c) to which he connected, at any time, the Toshiba USB Device and which accessed SGS's Confidential Information.

        d.    Compelling Defendant to identify all steps taken to copy SGS's confidential and proprietary information and/or trade secrets contained on the Toshiba USB Device;

        e.    Enjoining and restraining Defendant and his respective agents, servants, employees, and those acting in concert with him from using, or disclosing to any person or entity any confidential information, trade secrets and/or proprietary information of SGS or its clients;

        f.    Enjoining and restraining Defendant and his respective agents, servants, employees, and those acting in concert with him from accessing (prior to inspection), altering, deleting, destroying, and/or otherwise removing any non-privileged information or data from any computer(s), computer network(s), server(s), and/or any other storage device(s) (including, but not limited to, the Personal Laptop), electronic or otherwise, and/or email folder(s) and/or account(s) in any and all account location(s), that are in Defendant's possession, custody or control and that relate in any way to SGS, the business or potential business of SGS and/or any communication initiated and/or received by Singh during his employment with SGS that refer in any way to SGS's business, and/or the allegations of contained in this Litigation;

        g.    Compelling Defendant to identify all data storage devices (*i.e.*, USB drives, external hard drives, etc.) and cloud storage accounts in Defendant's possession, custody or control that have ever been used: (a) to store Plaintiff's non-public files or other confidential and proprietary information and/or trade secrets; or (b) in connection with Plaintiff's business; and

        h.    Awarding to Plaintiff such other relief as this Court deems just and proper, including, but not limited to, attorneys' fees and costs incurred by SGS as a result of its efforts to

recover its confidential and proprietary information from Defendant to date, as well as a reasonable sum to cover the services of expert witnesses including forensic experts and the costs incurred by SGS for the recovery of its Confidential Information to date, to the extent permitted by the DTSA.

2. Awarding damages to SGS, including, but not limited to, the recovery of the profits lost by SGS or gained by Defendant and business disruption costs;

3. Awarding compensatory damages to SGS, including, but not limited to, the recovery of the $15,000.00 Singh unlawfully acquired and retains as a result of his breach of the Relocation Repayment Agreement;

4. Awarding attorneys' fees and costs pursuant to the terms of the Non-Disclosure Agreement, 18 U.S.C. § 1836(b)(3)(D), N.J.S.A. 56:15-6(a), and as otherwise permitted by law;

5. Awarding costs of investigation as permitted by law, including the costs incurred by SGS for the forensic review of the Toshiba USB Device and for the recovery of its Confidential Information to date;

6. Awarding punitive damages pursuant to N.J.S.A. 56:15-4(b) and to the extent otherwise permitted by law;

7. Awarding exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

8. Awarding costs of suit; and

9. Awarding such other and further relief as the Court may deem just and proper.

**DAY PITNEY LLP**
**Attorneys for Plaintiff SGS North America Inc.**


By:    _/s/Heather Weine Brochin_
         HEATHER WEINE BROCHIN


DATED: January 22, 2025

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the matter in controversy is not the subject of any other action currently pending in any court and is not the subject matter of any arbitration or administrative proceeding.

By:    */s/Heather Weine Brochin*
       HEATHER WEINE BROCHIN

DATED: January 22, 2025

## **<u>VERIFICATION</u>**

I, David Chastain, of full age, do state:

1.      I am employed by Plaintiff SGS North America Inc. as a General Manager.

2.      I have read the foregoing Verified Complaint and am familiar with the facts set forth therein and, except for those matters alleged upon information and belief, I know them to be true of my own personal knowledge or review of documentation or I base my knowledge on the business records of or communications with Plaintiff and/or my communications with my co-employees at Plaintiff, upon whom I regularly rely.

I certify that the foregoing statements by me are true and correct.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DocuSigned by:

*David Chastain*

22BC4C52716A4B9...

_____
DAVID CHASTAIN

DATED:  January \_\_\_\_, 2025
1/20/2025

Exhibit A

## CONFIDENTIALITY AND ASSIGNMENT OF INVENTION AGREEMENT

This CONFIDENTIALITY AND ASSIGNMENT OF INVENTION AGREEMENT ("Agreement") is by and between Raj_____ Singh_____ ("Employee") and SGS North America Inc., by and on behalf of itself and any parent companies, successor companies, affiliated companies, and assigns (hereinafter referred to collectively as "Company").

### Confidentiality

Employee acknowledges that the Company has a compelling need to maintain confidentiality, and further recognizes that Employee's employment with the Company will place Employee in a position of special trust and confidence with access to confidential information concerning the Company and its operations.

For purposes of this Agreement, "Confidential Information" includes all non-public information and know-how, whether or not in writing and in whatever form (including electronic and/or e-mail form), concerning Company or its clients or the business or financial affairs of Company or of its clients. By way of illustration, but not limitation, Confidential Information may include trade secrets, inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, financial data, pricing data, personnel data, computer programs, client/customer lists, referral sources, and supplier lists.

During Employee's employment with Company and thereafter, Employee shall not – without prior written consent of Company – disclose or otherwise disseminate any Confidential Information to third parties or use Confidential Information for any purpose other than carrying out the terms of Employee's engagement by Company.

Other than in the ordinary course of Company's business, Employee shall not – without prior written consent of Company – directly or indirectly copy, take, or remove from Company's premises any Confidential Information in any form (including electronic and/or e-mail form).

At the request of Company or upon the termination of Employee's employment with Company for any reason, Employee shall immediately return and surrender to Company originals and all copies (including e-mails) of any Company property, including but not limited to any Confidential Information.

Notwithstanding the foregoing confidentiality provisions and/or nondisclosure obligations, pursuant to 18 USC Section 1833(b), an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (1) in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

### Assignment of Inventions

Employee hereby assigns to the Company all of Employee's right, title and interest in and to any and all ideas, designs, photographs, drawings, plans, computer programs or systems (including source code), concepts, techniques, algorithms, compositions, data,

DocuSign Envelope ID: 42B9A3E0-1008-4E75-8173-D48D67540D9E

database technologies, discoveries, domain names, formulas, improvements, inventions, works, practices, processes, research material (the "Inventions"), whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or jointly with others whether at the suggestion of the Company or otherwise, during the period of Employee's employment with the Company. Employee agrees that all such inventions are the sole and exclusive property of the Company.  Employee agrees to assist the Company in every proper way to obtain, and from time to time to enforce patents, copyrights, and other rights and protections relating to the inventions.  To that end, Employee agrees that Employee will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, sustaining and enforcing such patents, copyrights and other rights and protections on Inventions.  In addition, Employee agrees that Employee will execute, verify and deliver assignments of such patents, copyrights and other rights and protections to the Company or its designee. During Employee's employment, Employee agrees that Employee will disclose to the Company promptly, fully and in writing any and all Inventions.  In addition, after termination of Employee's employment, Employee will disclose all patent applications filed by Employee within a year after termination of employment.  Employee agrees that any patent application filed within a year after termination of employment shall be presumed to relate to an Invention made during the term of the Employee's employment unless Employee can sustain the burden of proving to the contrary.

### **General Provisions**

Notwithstanding any authority to the contrary:  (1) Company shall have the right to injunctive relief to restrain or enjoin any actual or threatened breach of the provisions of this Agreement; (2) in the event of any actual or threatened breach, Company shall, to the maximum extent allowed, have the right to suspend bonus payments, benefits and/or any exercise of stock options; and (3) if Company prevails in a legal proceeding to enforce this Agreement, then Company shall be entitled to recover its costs and fees incurred, including its attorney's fees, expert witness fees, and out-of-pocket costs, in addition to any other relief it may be granted.

The terms of this Agreement are severable.  The obligations in this Agreement survive the termination, for any reason whatsoever, of Employee's employment with Company (regardless of who initiates such termination).  The obligations in this Agreement also survive the promotion, transfer, demotion, and/or other change to the terms/conditions of Employee's employment, regardless of reason, and shall thereafter remain in full force and effect.

This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes all previous agreements, understandings, whether oral or in writing, between the Company and Employee with respect thereto. Notwithstanding the foregoing, this Agreement shall supplement, but not supersede any obligations of confidentiality or assignment of inventions that may be set forth in any Employment Agreement (including attachments) and any client or project specific agreement addressing confidentiality and/or intellectual property rights.

8/16/2022
_____
Date

DocuSigned by:

*Raj kamal Singh*
_____
379EAC4F956B4B4...
Employee Signature

Raj Kamal Singh
_____
Print Name

Confidentiality and Assignment of Invention Agreement – Multi-State
16.01.01v1